```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION

Phillip Tate,                   :

          Plaintiff,            :   Case No. 2:06-cv-0047

   v.                           :   JUDGE SMITH

Joe Williams, et al.,           :   MAGISTRATE JUDGE KEMP

          Defendants.           :
```

OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment filed by the pro se prisoner-plaintiff, Phillip Tate (doc. #18), and the defendants, Dr. Ventosa, Mr. Wittekind, Mr. Williams, Mr. Frizzel, Mr. Wolfe, Ms. Eberlin and Mr. Wilkinson (doc. #17). Also before the Court is Mr. Tate's motion to strike (doc. #18). For the following reasons, the defendants' motion for summary judgment will be granted on the second and third instances of retaliation claims. Both motions for summary judgment will be denied on the denial of exercise claim. Moreover, the motion to strike will be denied.

I.

In Mr. Tate's complaint, he alleged various claims against numerous defendants arising out of events that transpired while he was incarcerated at the Noble Correctional Institution ("NCI") and the Belmont Correctional Institution ("BCI"). The defendants filed a motion to dismiss, which was granted in part. The only remaining claims that are the subject of these motions for summary judgment are the Second Instance of First Amendment Retaliation Claim, Third Instance of First Amendment Retaliation Claim, and the denial of out-of-cell exercise in violation of the Eighth Amendment. The only remaining defendants are the ones identified, supra. The Court will evaluate these three remaining claims under the summary

judgment standard. Because the motion to strike involves affidavits and documents that are attached to the defendants' motion for summary judgment, the Court will address whether this evidence should be stricken when evaluating the pertinent claims.

## II.

Fed. R. Civ. P. 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original); Kendall v. The Hoover Co., 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is,...[and where] no genuine issue remains for trial,...[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 467 (1962); accord, County of Oakland v. City of Berkley, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict . Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson, 477 U.S. at 250.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (footnote omitted); accord, Adams v. Union Carbide Corp., 737 F.2d 1453, 1455-56 (6th Cir.1984), cert. denied, 469 U.S. 1062 (1985). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Watkins v. Northwestern Ohio Tractor Pullers Association, Inc., 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes, 398 U.S. at

3

157-60; Smith v. Hudson, 600 F.2d 60, 65 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 251. As is provided in Fed. R. Civ. P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 259 (1968) (footnote omitted).

### III.

In order to make out a successful First Amendment retaliation claim, an inmate must prove that (1) the inmate engaged in protected conduct; (2) an adverse action was taken against the inmate that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated, at least in part, by the inmate's protected conduct. Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir.1999). If an inmate successfully establishes that an action was taken in

4

retaliation for the exercise of rights protected by the First Amendment, the defendants may still prevail if they can prove that the same action would have been taken in the absence of protected activity. Id. at 399 (citing Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274 (1977)). The defendants have the burden of proving a Mt. Healthy defense by a preponderance of the evidence. In general, it is difficult for an inmate to establish the first prong of the First Amendment retaliation analysis because prison regulations may constitutionally curtail an inmate's First Amendment rights so long as they are rationally related to a legitimate penological interest. Id. at 395 (citing Turner v. Safely, 482 U.S. 78 (1987)). Thus, if an inmate violates a legitimate prison regulation, that inmate is not engaged in protected conduct and fails to establish a retaliation violation. Id.

### A. Second Instance of Retaliatory Conduct

The crux of this claim centers around a letter that Mr. Tate sent to Dr. Ventosa that stated (reproduced verbatim): "The only obvious difference between this inmate and I is that he is White while I am African American." As a result of sending the letter, Mr. Tate received a 15-day commissary restriction for disrespecting a staff member.

In support of their position, the defendants have submitted Joel Burris' affidavit, which states that, following a hearing on these charges, Mr. Tate was found not guilty of disrespecting a staff member and his prison record was expunged of these charges. Mr. Tate has moved to strike this affidavit because it is allegedly fraudulent and deceitful. The Court rejects this argument because the affidavit was sworn under oath and notarized. The Court simply cannot weigh the credibility of an affidavit. If Mr. Tate had wished to contradict the affidavit, he could have filed a contrary affidavit. The Court will therefore address the merits of the

summary judgment motion as it is related to the Second Instance of Retaliatory Conduct.

Because Mr. Tate was ultimately found not guilty of this infraction, his record was expunged of such conduct. Thus, the defendants contend that Mr. Tate was not subject to any adverse action. Conversely, Mr. Tate claims that, regardless of the ultimate disposition or notation on his prison record, he was still penalized when he received a 15-day commissary restriction for disrespecting a staff member. Because the Court finds that this claim fails on the "adverse action" prong of the test, further discussion about whether Mr. Tate engaged in protected activity is unnecessary.

The record in this case indicates that Mr. Tate received, and was subjected to, a 15-day commissary restriction for sending the letter to Dr. Ventosa. Further, evidence demonstrates that Mr. Tate's record was expunged of all allegations and conduct surrounding Dr. Ventosa's charges. The issue, therefore, is whether the 15-day commissary restriction constitutes adverse action.

The Court of Appeals, in attempting to define "adverse action," stated:

> Like the definition of protected conduct, however, the definition of adverse action is not static across contexts. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action against them is considered adverse. The benefits of such a standard are that it is an objective inquiry, capable of being tailored to the different circumstances in which retaliation claims arise, and capable of screening the most trivial actions from constitutional cognizance. We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this

> threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment. Retaliation against a prisoner is actionable if it is capable of deterring a person of ordinary firmness from exercising his or her right to access the courts.

Thaddeus-X, 175 F.3d at 398. In the prison context, "adverse action" includes "harassment, physical threats ... transfer to a prison area of the prison used to house mentally disturbed inmates," id., and deprivation of pain medication, Hall v. Nusholtz, 234 F.3d 1268, 2000 WL 1679458, at *2 (6th Cir.2000)(unpublished). As other courts have noted, however, it does not necessarily include short and temporary loss of commissary restrictions. See, e.g., Ghosh v. McClure, 2007 WL 400648, at *13, fn. 8 (S.D. Texas Jan. 31, 2007) (unpublished)(loss of commissary and recreational privileges for ten days is not an adverse action); Bartley v. Collins, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006)(unpublished)(30-day loss of commissary privileges was *de minimis* and did not constitute adverse action); but see Hart v. Hairston, 343 F.3d 762, 764 (5th Cir.2003)(27 days of commissary and cell restrictions is adverse action).

Based on the current record, it appears that Mr. Tate's 15-day commissary restriction most resembles the retaliation described in Ghosh and Bartley rather than the disciplinary action in Hart. Whereas Hart's "adverse action" encompassed a 27-day commissary restriction and cell restrictions, Mr. Tate's punishment involves only a 15-day commissary restriction and nothing more. While the Court recognizes the importance of the commissary in some prison settings, this brief restriction is not capable of deterring a person of ordinary firmness from exercising his or her constitutional rights. Accordingly, as a matter of law, the Court concludes that a 15-day commissary restriction, by itself, is a *de*

7

*minimis* punishment that falls short of being constituted an "adverse action." It cannot be categorized on the same level as physical threats, administrative segregation, cell restrictions, deprivation of pain medication, or transfer to the prison's mental health ward. Thus, the defendants' motion for summary judgment is granted on this claim.

### B. Third Instance of Retaliatory Conduct

This alleged instance of retaliatory conduct involves a grievance Mr. Tate filed against Captain Erdos. Mr. Tate argues that he was placed in segregation for filing the grievance against Captain Erdos. The defendants claim that, at or about the same time this grievance was filed, prison authorities discovered that Mr. Tate was engaging in an inappropriate relationship with a corrections officer. The defendants claim Mr. Tate was placed on disciplinary control for this conduct.

While filing a grievance is protected conduct under the First Amendment, Herron v. Harrison, 203 F.3d 410, 415 (6th Cir.2000), conduct that violates prison rules is not, Thaddeus-X, 175 F.3d at 395. In this instance, the evidence demonstrates that Mr. Tate's placement in disciplinary control either was not motivated by his filing of the grievance or would have occurred regardless of the protected conduct. Put simply, because it is uncontradicted that Mr. Tate established an inappropriate relationship with a corrections officer, a charge on which he was found guilty by a Rules Infractions Board, and because the punishment at issue was handed out based on that finding, there are no genuine issues of material fact about why Mr. Tate was placed in disciplinary control. It occurred not because of the grievance against Captain Erdos (who is not a named defendant in this case), but because Mr. Tate violated prison rules. Accordingly, summary judgment will be granted in favor of the defendants on this issue.

### IV.

The denial of exercise claim in violation of the Eighth Amendment involves alleged instructions given by the Warden of BCI, Ms. Eberlin, to prohibit Mr. Tate from engaging in exercise while confined to the infirmary for a two-month period.  The defendants argue that (1) Mr. Tate failed to exhaust his administrative claims because he filed the grievance against Ms. Eberlin, not the local staff member denying the right to exercise; (2) according to Mr. Tate's medical examination, he was unable to stand for ten minutes and, therefore, could not participate in outdoor exercise; and (3) Mr. Tate failed to provide evidence of an Eighth Amendment violation.

Preliminarily, the Court notes that it rejects Mr. Tate's motion to strike the medical evidence regarding Mr. Tate's condition and inability to stand for more than ten minutes.  This evidence is relevant to the issue of whether Mr. Tate should have been given exercise privileges.

Next, the Court rejects the defendants' argument that Mr. Tate failed to exhaust all administrative remedies.  The complaint alleges that Ms. Eberlin personally denied Mr. Tate's request for exercise.  Therefore, the grievance against Ms. Eberlin was correctly filed with the chief inspector in accordance with the Ohio Administrative Code.  (See Report and Recommendation at p. 9). The Court will therefore examine the merits of this allegation.

In conditions of confinement cases in violation of the Eighth Amendment, an inmate must prove two elements, one objective and the other subjective.  Farmer v. Brennan, 511 U.S. 825 (1994).  First, under the objective element, the inmate must demonstrate that the defendant's act or omission resulted in the loss of the minimal civilized measure of life's necessities.  Id. at 834.  Second, under the subjective prong, the inmate must show that the defendant both knew of and disregarded an excessive risk to the inmate's health and safety.  Id.

"It is generally recognized that a total or near-total depravation of exercise or recreational opportunity, without penological justification, violates Eighth Amendment guarantees." Patterson v. Mintzes, 717 F.2d 284, 289 (6th Cir.1983). Factors to evaluate whether the Eighth Amendment is violated in denial of exercise cases are: size of the cell, opportunity for contact with other inmates, time per day expended outside the cell, justifications for denial of the right to exercise, physical or psychological injuries resulting from a lack of exercise, and a particularized need for exercise. Id. However, restrictions on exercise for security or other legitimate reasons do not violate the Constitution. See, e.g., Selby v. Martin, 84 Fed.Appx. 496, 498 (6th Cir.2003)(no Eighth Amendment violation for inmate wearing chains during exercise time due to inmate's previous escape attempts)(unpublished)(citing LeMarie v. Maas, 12 F.3d 1444, 1457-58 (9th Cir.1993)). The Eighth Amendment prohibits conduct that is obdurate and wanton. Id. (citing Whitley v. Albers, 475 U.S. 312, 319 (1986)).

The record in the instant case reveals that Mr. Tate has a permanent medical restriction that limits him to standing no longer than ten minutes due to deep vein thrombosis. Moreover, upon arrival to BCI, Mr. Tate complained of chest pain and leg discomfort. Mr. Tate's medical history also indicates a history of deep vein thrombosis.

Further, the evidence also demonstrates that, despite Mr. Tate's residence in the prison infirmary, he was still on segregation status for attempting to establish a relationship with a corrections officer while at NCI. Accordingly, Mr. Tate was under the restrictions associated with that status for the two months he was housed in the infirmary.

In attempting to refute these justifications for the denial of exercise, Mr. Tate claims (reproduced verbatim):

> I was never "admitted" to the infirmary at [BCI] ... for treatment of any disorder or cmplaint. I have had a "ten minute standing restriction" in place since being diagnosed with a blood clot ailment on January 31, 2002. I was permitted to walk around the open campus compound of NCI daily prior to my transfer on March 18, 2005 to [BCI]. While in segregation at NCI on August 12, 2004 I was provided opportunities for out-of-cell exercise with my ten-minute standing restriction intact.
>
> From March 10, 2005 to March 17, 2005, I was in segregation at NCI and given opportunities for out-of-cell exercise (5) hours per week with my (10) minute standing restriction in place.
>
> I was housed in the segregation unit at Pickaway Correctional Institution from August 11, 2003 to September 29, 2003. I was provided with outdoor out-of-cell exercise with a (10) minute standing restriction in place.
>
> From September 29, 2003 to October 15, 2003 I was housed in segregation at [BCI] and given the opportunity for out-of-cell exercise (5) hours per week with a (10) minute standing restriction in place.
>
> \*\*\*
>
> [BCI] personnel and defendants maintain copies of records such as medical co-payments, commissary purchases, and segregation Employee Sign-In Contact Sheets posted outside of my door which corroborates that I was not a patient admitted to the infirmary as such "patients" are not charged the $3.00 co-payments for visits and I was. My commissary purchases indicate that I could only by segregation status-approved items and the Sign-In Log verifies that defendant Eberlin, Mr. Forshey and others regularly appeared at my cell and denied my requests for out-of-cell exercise.

11

> On Thursday, April 21, 2005, I was escorted across the compound to the Vault area to retrieve legal documents where I had to stand and walk with a (10)-minute standing restriction in place.
>
> The 10-minute standing restriction permits me to move around, walk freely, but not stand in one place for longer than that amount of time. This is because gravity impacts my leg and exascerbates pain and swelling due to poor circulation when I am upright.
>
> After filing my April 26, 2005 grievance against Warden Eberlin, I was moved to segregation in late-May without seeing a doctor of any kind and regularly escorted from segregation on walks to the infirmary for lab work. There was no medical reason or physician order to withhold out-of-cell exercise from me. Warden Eberlin informed me that it was her decision and orders which is why I grieved to the Chief Inspector against her.

(Aff. of Mr. Tate, ¶¶ 11-14, 17-20).

There appears to be conflicting evidence surrounding the alleged denial of exercise claim. Mr. Tate was allegedly under doctor's orders that prohibited him from engaging in daily exercise. Yet, the only medical evidence in the record is (1) a medical restriction indicating that Mr. Tate should not stand for a period of time longer than ten minutes and (2) a report from March 18, 2005 in which Mr. Tate complained of chest pain and leg discomfort. There are no other medical reports, depositions or affidavits supporting the defendants' claim that there was a medical reason for denying Mr. Tate out-of-cell exercise. Thus, the only evidence in the record that supports a medical restriction on out-of-cell exercise is the fact that Mr. Tate has been diagnosed with DVT for several years. However, according to Mr. Tate's sworn statement, he consistently walks around the prison and

has always been permitted to engage in out-of-cell exercise.

Further, regardless of Mr. Tate's segregation status in or outside the infirmary, he is still protected by the Eighth Amendment, which prohibits the total deprivation of out-of-cell exercise.  As Mr. Tate highlighted, through his incarceration period, there have been several occasions where he was in segregation but was still permitted to participate in limited weekly exercise.  During the two months in question, however, Mr. Tate was prohibited from exercising or leaving the infirmary.

In reviewing all this evidence, the Court concludes that there are genuine issues of material fact surrounding whether Mr. Tate's Eighth Amendment rights were violated.  The record is not clear as to whether Mr. Tate was under a medical restriction that prohibited him from participating in the limited out-of-cell exercise that is guaranteed to inmates on segregation status, nor is there any evidence regarding whether Mr. Tate was allowed to leave his bed and move around the infirmary.  Additionally, there is a lack of evidence that penological justification outweighs Mr. Tate's right to out-of-cell exercise.  Finally, there is no evidence or allegation that Mr. Tate was physically or psychologically harmed by the denial of out-of-cell exercise. Because of this conflicting evidence, a reasonable jury could return a verdict for either party.  Thus, the motions for summary judgment on this claim will be denied.

V.

Based on the foregoing, the defendants' motion for summary judgment (doc. #17) is GRANTED to the extent of the Second and Third Instance of Retaliatory Conduct.  Both motions for summary judgment are DENIED on the denial of exercise claim.  Finally, Mr. Tate's motion to strike (doc. #18) is DENIED.

/s/ George C. Smith
George C. Smith
United States District Judge